### North Chicago St. R. R. Co. v. William E. Allen.

1. VERDICTS—*When to be Sustained.*—When reasonable and fair-minded persons might differ in their conclusions on the evidence in question, the verdict will be sustained.

2. ELECTRIC CARS—*Care to be Exercised by the Motorman.*—The driver of an electric car, when he discovers persons driving ahead of

him on the track, must exercise a higher degree of care than would be required of him under other circumstances, but ordinary care and prudence under the particular circumstances of this case, were all that is legally necessary to avoid liability.

3. JUDGMENTS—*When Substantial Justice Has Been Done.*—A judgment should be affirmed where substantial justice on the whole case has been done.

**Trespass on the Case,** for personal injuries. Trial in the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the October term, 1898. Affirmed. Opinion filed March 30, 1899.

**Statement of the Case.**—Appellee was injured February 24, 1896, by a collision between appellant's electric car and his wagon while he was driving in the car tracks along Clybourn avenue, Chicago, some 200 to 250 feet north of Willow street, in a south-easterly direction, about 9:45 P. M. of that day. Appellant's car was going in the same direction as appellee was driving, and came up behind him and struck his wagon just as he was in the act of turning out of the car tracks to the left, after having discovered, by the singing noise of the electric wires overhead, that a car was approaching him from behind.

A trial before the court and a jury resulted in a verdict and judgment for appellee of $1,000, from which this appeal is taken.

Appellant, among other instructions, asked the court to give the following instruction, which the court refused, viz.:

No. 10. " A company operating a street railway upon a public street is bound to use ordinary care for the safety of the people using the same. But on account of the cars of said company being confined to a fixed track and being unable to turn out for passing vehicles, it is the duty of persons driving upon the street when notified of the approach of a car to turn out for the passage of the same; and if the jury believe from the evidence that the plaintiff neglected to promptly turn out when he became aware of the approach of the car from behind, then they have a right to consider whether his neglect to do so was a lack of such care for his own safety as a reasonably prudent person would have exercised under similar circumstances."

The court modified this instruction by striking out the word " ordinary " in its first sentence and inserting instead thereof the words " a high degree of," and as thus modified the instruction was given.

The evidence as to the care of appellee and the negligence charged against appellant of running its cars at a high, reckless, careless, improper, unusual and unreasonable rate of speed, clearly preponderates in favor of appellee.

Appellee testified in part, viz.:

" On the evening of February 24, 1896, I was on Clybourn avenue north of Willow. I was on my way home, driving south or southeast on Clybourn avenue in a one-horse carpenter spring wagon. I heard the vibration of the wires over my head and looked back and saw a car coming, and I turned to the left to get out of the track, and on account of the snow piled up on the right-hand side of the track, I turned to the left, to the other side, and got the wagon partly out when the car struck the back end of the wagon, pitched myself and Mr. Biggs over to the sidewalk, smashed my wagon and broke my foot. When I looked back and saw the car coming I did not see any one at the motor in front of the car. The gong did not ring nor was there any signal given of the car coming. My horse was going in a trot. There were two tracks. I turned to the left on account of the snow being piled up right on the right-hand side. I could not get out, so I turned to the other track as the car struck the back end of the wagon. After I first looked, I looked again. I knew the car was going to hit me, and I hugged to the back end of the seat and kind of looked back at the same time and fetched the reins down beside the horse after she got headed out of the track. The horse went out of the track on a trot at the time. It was shortly before the car struck me that I looked back this second time. I was going southeast. The car was going the same way on the same track. Henry Biggs was with me. After the wagon was struck I had to put on four wheels, two springs, seat, a pair of shatts. The wagon was in good shape before the accident. It straightened both axles. The wagon was in front of the blacksmith shop; near the blacksmith shop after the accident. Partly on the sidewalk and partly in the street—on the left-hand side, east or southeast. Mr. Biggs was out of reach underneath the wagon, and I was right down near the horse, about the

horse's hips, and the horse was more to the right on the sidewalk.  Before I undertook to get up I looked to see where the car was, and it was still in motion.  It stopped down near Willow street, about 250 feet from where the wagon was struck.  There was snow on the ground at the time.  It was not dark; it was a pleasant evening.  We could see quite a distance, possibly, I should say, a block; we could distinguish objects plainly.  It was not storming at that time.  The horse was going at the rate of six miles an hour.  As soon as I knew that the car was coming I steadied the horse by taking the reins, but didn't slack her up any.  I held the reins and at the same time steadied her. I turned her out and as I got her headed out I loosened the reins and slapped her along the hips with the reins.  I had no whip with me that night."

On cross-examination he testified, in part, viz.:

"My wagon was in good condition at the time it was struck.  The car hit it near the left hind wheel.  The car struck the back end of the box and grazed along, as I saw afterward by the paint being knocked off; part of the car hit the left hind wheel.  The wagon must have been nearly out of the track when the car struck it.  The wheel was smashed.  I can not say that the car hit it squarely; it hit it hard enough to leave a mark.  I believe it broke one or two spokes and marked up the felloe.  It simply went through the other hind wheel and the hub.  Just after the accident I was lying, I should judge, eight or ten feet east, southeast as it may be, from where the wagon laid.  I was thrown out on the right-hand side of the wagon.  We were both thrown on the right-hand side of the wagon.  The wagon was kind of sloping across the street.  The horse was on the sidewalk altogether.  I am not positive as to whether the horse was thrown down.  It was either thrown onto my stomach or I was thrown onto her hips.  The horse was scratched on one hind leg and generally shaken up.  I kept her in the barn for some little time.  I didn't use the horse only to exercise her out in the lot.  I had my boy take her out into the lot, for two or three weeks anyway; she wasn't able to work.  I was conscious all the time; I immediately tried to get up and went down again.  I looked first to see the car going, and then I looked for Mr. Biggs, and when I seen where he was I made an attempt to go to him.  I was sitting in the snow, and immediately after I was thrown out and struck the snow, I looked to see what did the work, and it was still in motion.  It went probably

250 feet before it stopped. The first intimation I had of the car's approach was the hissing sound of the wires. I looked back then and saw the car coming toward me; it was possibly fifty or one hundred feet away. I didn't see anybody upon the front platform of the car. I am not positive as to whether the head-light of the car was lit. I think it was, but I am not positive. I am positive there was no bell rung, either before or after the car passed. I don't really know how far nor how long I had been riding on Clybourn avenue before the accident. I had been riding on Clybourn, from where Racine runs into it, over to where I was hit. I had not been riding on the track all the way; I had been in the track some little distance; I can not give an idea how far. I drove out long enough for a car to pass, I know. I could not stand it to ride on and over such rough roads. It was rough outside, and then I turned into the tracks. I had not been in the track a great while before I was hit."

His comrade, Biggs, who rode on the wagon with him, says that when appellee started the horse with the lines he turned round to see what was the trouble, and saw the car coming right at the back of the wagon; that he did not hear the gong or bell ring; that they heard it on the other car and got out of the track then; that the horse was traveling on a fast trot; that they depended on the gong or alarm in order to get out of the track; that he was unconscious for some time after the accident, didn't know where he fell, was taken away and didn't see the wagon after the accident.

Louis Kahn, for appellee, testified:

"I was living at 438 Clybourn avenue. I heard a crash right, I should say, very near in front of the house that I lived in. I ran out to see what it was. I found one of the gentlemen, I don't know what his name is, lying under the wagon. I pulled the wagon off and helped him to the drug store. The wagon was lying, when I saw it, half on the side walk and the other half in the street near the curbstone. The wagon was lying partly on Mr. Biggs. I could hear the car going by the house. I did not hear any bell sounded. If it had been sounded I would have heard it. The wagon was broke but I don't remember what was broken on it. When I came out the car had not stopped altogether. I went down to Hoprick's saloon, I should judge it to be

pretty near 300 feet from where the accident happened. By the sound the car must have been going very rapidly or would have stopped sooner. I was sitting in the front parlor where I lived. I should judge as near as I can remember that it was a light night.

### Cross-examination.

" I was sitting in my front parlor and the doors and windows were all closed. I know that the bell was not ringing, because if it had rung I could have heard it. I am sure the car ran way down in front of that saloon before it stopped. When I ran out to the injured man the car was just slacking up. My attention was not engrossed in the injured man, because the first thing I saw was the wagon, and the next thing I seen was the car. It had stopped at that time, because by the time I got up to help pull the man out the car had certainly stopped. I should judge it is 300 feet from where I lived up to Willow street."

William Kahn, who is a brother of Louis Kahn, testified:

" My first knowledge that anything unusual had occurred was I heard the crash. I ran outside to see what had happened; out to the sidewalk—out in front. I was sitting at the front window when I heard the crash, with my brother that has just testified. When I ran out to the sidewalk I saw the wagon laying at the curbstone, and saw Mr. Biggs lying underneath the wagon, and Mr. Allen laying a little bit further south, a little south of the wagon. The wagon laid partly on the sidewalk and partly in the street over the curbstone, in front of the blacksmith shop, on the east side of the street, the same side I lived on. The car struck the wagon about 436 or 438, almost in front of my house, between the two of them. This blacksmith shop is fifty feet from where I lived. At the time I came out, the car had not entirely ceased to run. I went outside and saw the car still going. It was still going at the time I went out. It was just slacking and coming to a stop. I noticed the wagon and noticed how they were laying and how they were hurt—the men. I know that the car bell did not ring on this evening previous to the crash. I am positive of that. If it had rung I would have heard it. I was at the front window, sitting by the front window, talking with my brother, I think. Besides us, my sister-in-law was there. We three were in the front parlor talking. The first notice we had of the accident was a crash. We all ran out at the same time as quick as we could. My place is a quarter of

a block from Willow street. The car stopped this side of Willow street, seems to me right by it. I don't recollect whether the whole car was north of Willow when it stopped or not; I didn't go up to look whether it was north or south. I noticed the car. I noticed and looked in front of the car, but I don't know how far it ran."

Mrs. Joseph Ficke, who lived at 426 Clybourn avenue, testified: " I had just retired. I heard a terrible crash, and then I got up out of bed ; " also that as soon as she dressed she went out and saw the wagon about 200 feet from her house, part of it in the street and part on the sidewalk ; that " the car went by our house about as fast as it could go; " that she heard no bell ring before she heard the crash, and would certainly have heard it had it rung; that the car was about 250 feet south of her house when she came out, and her house is 250 feet from the corner of Willow street. She is fully corroborated by her husband, who was in the house but had not retired.

Mrs. Anna Mosner, who lived at 430 Clybourn avenue, was sitting at her front window, and says: "I heard a crash and then I heard a car go by just as fast as it could go, and then I went out to see what was the matter. When I got outside the car was going. I looked after it and saw it stop near the corner up the street, near Willow street. I did not hear the noise of a bell or gong. I saw the wagon part the way on the sidewalk and part on the street." Her husband, who sat near her, corroborates her as to the crash, the location of the wagon and speed of the car.

For appellant, the conductor testified that the gong rang loud, as though something was ahead; that the wagon was then 200 to 300 feet from the car ; that he gave the bell for Willow street 100 to 150 feet from Willow street for a lady to get off, and after that the car went fifty to seventy-five feet, and he noticed the car dip suddenly and come to a sudden stop which threw him against the door; the lady got off and he went through and asked the motorman what was the matter, and that " he said he struck a wagon ; " that this was the first he knew there was an accident; that he then got off the car and went back to the wagon, which was

a car length and a half from the car; that the car started up again and stopped at the drug store near the corner of Willow street, where the other witnesses say it stopped for the first time after striking the wagon. He also said he didn't feel any shock or jar or hear any smash when the car collided with the wagon. He does not testify as to the speed of the car.

The motorman says he rang the gong all the time as he came down Clybourn avenue before the car struck the wagon; is indefinite as to the speed of the car, one time saying he "wasn't going at such a tremendous speed," at another, that he "wasn't going ten miles an hour, I am sure of that. I wasn't going nine or ten miles an hour; about four or five miles. If the wagon was going at the rate of five or six miles an hour, I don't think I would have struck it at all." Also, "I was not running as fast as the car could go. The car can go may be ten miles an hour. It can go twelve miles an hour." There is nothing in his evidence to indicate that the appellee did not exercise ordinary care for his own safety, except that he did not turn out from the ringing of the gong, but the appellee and his comrade both say they did not hear a gong ring. He also says, "I struck in the rear and threw them over in the other track. The car, after it struck the wagon, ran, maybe, twenty or thirty feet. After the men went in the drug store at the corner of Willow street, I pulled the car to the front of the drug store and stayed there until the conductor came out. I was about 150 feet away from the wagon when I got the view (of the wagon) by the headlight of the car. I was then ringing the gong steadily. I thought the men were going to turn out. The snow was kind of hard in spots, it was making the car slide a little." In another connection he says: "It was snowy weather, snowy, kind of soft that night, soft all day." Also, "The snow was soft at that time. It had been thawing that day or night. I know it was warm weather." As to the force of the collision with the wagon, he says: "I don't know whether it was smashed or not. I didn't hear it smash. I do not know

how far the wagon was thrown by the shock when the car struck it. I do not want to say how far. My best guess is it was over on the other track; that would be only about three feet. I didn't feel any tremor of the car, it didn't shake at all. I would not have known that the accident occurred if I had not seen it. It made a noise when it hit the dashboard. It did not make very much noise, just a little, gentle noise."

The United States Weather Bureau records show that the temperature at 7 p. m., February 24, 1896, was 31 degrees, and during the night it reached 38.6 degrees, and that no snow or rain fell that day or evening until 9:45 p. m., when it began to snow.

The witness Peak, for appellant, testified that he saw the accident; was going south on Clybourn avenue and was about twenty-five feet from the wagon at the time of the collision; that the car ran about three lengths after it struck the wagon; that the bell rung pretty hard, and it made him look around; the car was then about 125 feet from the wagon; that he saw the man (appellee) turn around and keep on a little ways, then started to turn out when the car hit the wagon. On cross-examination he says the car was " running just middling speed; it was not going very fast. It was not going full speed, that is one sure thing. I was not much judge about the railroad business at that time. I don't know how many miles an hour the car was going. I could not tell you anything about that." He also denied having made to appellee, and in presence of Ficke, contrary statements as to the gong ringing and the speed of the car. It also appears that at the time of the accident, this witness was out of employment " and had not been busy for a long time; " that about a week after the accident he was communicated with by an agent of appellant, or its lessee, and that soon thereafter he was given employment by appellant which he still retained at the time of the trial.

On rebuttal, Joseph Ficke testified that Peak, at the drug store, immediately after the injury, stated that the car was going full speed without any gong ringing at the time it struck the wagon. Appellee also testified that on March 11, 1896, Peak stated to him that he did not hear any bell or

North Chicago St. R. R. Co. v. Allen.

gong sounded at all, and that the car was running very fast when it struck the wagon.

The only other witness, Schlihimer, called by appellant, as to the accident, said he was upstairs in his house, 413 Clybourn avenue, which is on the west side of the street, about 300 feet from where the wagon lay after the accident; that he ran down stairs when he heard the noise, and went to the place of the collision; that the car was then standing about half way between his house and Willow street, and that it moved up toward the drug store and stopped. On cross-examination he stated, among other things, viz.:

" I did not see the accident; I came there when it was over. I lived at 413 Clybourn. The wagon, when I found it, was right next door to a blacksmith shop on Clybourn avenue, on the east side of the street, about 300 feet from where I live. I heard the car when it struck the wagon. It was a pretty loud smash. I could hear it inside the house, and we didn't have our windows open. I didn't take notice of the car before it struck the wagon. I didn't hear it at all before it struck the wagon. I did not hear it after it struck the wagon, I seen it. I saw it after I got out. I didn't hear it any more. When I got out the car was not still in motion, the man was picking up the lamp."

Alexander Clark, attorney for appellant.

A street railway company is bound to use only ordinary care for the safety of persons in vehicles upon the streets. Booth on Street Railways, Sec. 309; Unger v. R. R. Co., 51 N. Y. 497; Chicago W. D. Ry. Co. v. Ryan, 131 Ill. 474.

An electric road is governed by the same rules as a horse railroad. C. & P. St. Ry. Co. v. Meixner, 160 Ill. 320. Also a cable road. Rack v. City Ry. Co., 173 Ill. 289.

What is ordinary care depends upon the circumstances of each case. W. C. St. Ry. Co. v. Manning, 170 Ill. 417; C. & A. R. R. Co. v. Adler, 129 Id. 335.

Jesse A. & Henry R. Baldwin, attorneys for appellee.

Mr. Presiding Justice Windes, after making the foregoing statement, delivered the opinion of the court.

The only points argued by appellant's counsel in his brief

are that for the failure of appellee to show ordinary care, the court should have instructed the jury to find for appellant, and that the court erred in modifying the instruction quoted in the statement, and given as modified as instruction ten.

We are clearly of opinion that the evidence relating to the care exercised by appellee was such that it could not be said, as matter of law, he was not in the exercise of ordinary care for his own safety, but that this was a question peculiarly for the jury, on which they were fully instructed. Reasonable and fair-minded persons might well differ on this point in their conclusions on this evidence. We think the evidence sustains the verdict in this respect. Penn. Co. v. Frana, 112 Ill. 398; Ry. Co. v. Manning, 170 Ill. 421; Offutt v. Columbian Exp'n, 175 Ill. 473, and cases cited.

The modification of instruction ten by the court was error. It should have been given as asked. While it may be said that the care which it was incumbent on appellant's servant to exercise when he saw that appellee was driving ahead of him on the tracks, was a higher degree of care than would have been required of him under some other circumstances, still ordinary care and prudence under the particular circumstances were all that were legally necessary to avoid liability to appellant. 1 Thompson on Neg., 396, n. 2, and cases cited; Booth on St. Rys., Secs. 305 and 309, and cases cited; Ry. Co. v. Ryan, 131 Ill. 474; Ry. Co. v. Manning, 170 Ill. 427–31; Roller v. Ry. Co., 66 Cal. 230; Ry. Co. v. Witten, 74 Tex. 202.

But notwithstanding the error in this instruction we are of opinion, after the most careful consideration of the evidence, that with a proper instruction, the jury could not have reached a different conclusion than they did as to appellant's negligence as to the rate of speed of its car, and that by reason thereof appellee was injured. We have set out with some particularity in the statement the evidence bearing upon the rate of speed of the car. No disinterested and fair-minded person could read the evidence without, in our opinion, reaching the conclusion that appellant's car was being run at a high, reckless and unreasonable rate of speed,

and that this is shown by the clearest preponderance of the evidence.   There is practically no dispute that after the accident, the wagon, a long carpenter's wagon, was thrown, by the force of the collision, from one track across another and partly onto the sidewalk, and that the noise of the crash was heard by at least five disinterested persons in their houses, some distance away, with closed doors and windows, and also that after the collision the car ran from 150 to 250 feet before it came to a stop.   The testimony of the conductor that the first he knew that there had been a collision was when he was told by the motorman, and that it only made a little, gentle noise, and he felt no tremor of the car, might very properly have been disregarded by the jury. The motorman is very indefinite and conflicting in his statements of the speed.   The witness Peak's evidence, was certainly not of much weight, considering his contradictory statements testified to on rebuttal.   Appellant's own witness, Schlihimer, says he was 300 feet away, inside his house, with windows not open, and heard the crash of the collision.

Had the speed of the car been slackened to a reasonable rate, we think it clearly apparent there would have been no accident.

Another trial could only, in our opinion, result in a verdict for appellee.   No complaint is, and could not reasonably be, made as to the amount of damages.   A judgment should be affirmed where substantial justice on the whole is done.   Lebanon, etc., Ass'n v. Zerwick, 77 Ill. App. 491, and cases cited; Ry. Co. v. Wilson, Id. 608.

The judgment is affirmed.